[No. 37446.   Department Two.   April 15, 1965.]

SAFECO INSURANCE COMPANY OF AMERICA, INC., *Respondent,*
v. PACIFIC INDEMNITY CO., *Appellant.**

*Guttormsen, Scholfield, Willits & Ager,* by *Jack P. Schol-field,* for appellant.

*Reported in 401 P.2d 205.

*Clinton, Moats, Andersen & Fleck,* by *James A. Andersen,* for respondent.

. BARNETT, J.†—This is an appeal from a judgment of the Superior Court of King County in which plaintiff (respondent) obtained a judgment against defendant (appellant) in the sum of $3,618, plus costs. Final determination is sought as to which of two insurance policies covers liability arising out of a collision between two automobiles. Only one accident occurred and each insurance company contends the other is primarily liable.

The respondent Safeco Insurance Company of America, Inc. (hereinafter referred to as Safeco), carried the liability insurance of one Arnold W. Gilbert. The appellant Pacific Indemnity Co. (hereinafter referred to as Pacific), carried the liability insurance of Claude Larson, doing business as Larson Auto Brokers.

The case was tried without a jury and the court made findings of fact and conclusions of law favorable to Safeco. The court found, *inter alia,*

4. That on November 16, 1958, plaintiff's assureds, Arnold W. Gilbert and his son James Gilbert, went to the Larson Auto Brokers used car lot located in Seattle, Washington, for the purpose of looking at a used car to be purchased for James Gilbert. James Gilbert was sixteen years of age and a licensed driver. One Laddie Henderson, who was a salesman for Mr. Claude Larson d/b/a Larson Auto Brokers, showed a 1951 Chevrolet 4-door sedan owned by Larson Auto Brokers to Mr. Arnold W. Gilbert and his son James Gilbert. Mr. Laddie Henderson was told that the 1951 Chevrolet was being purchased for James Gilbert and so stated in a conversation that he had with Mr. Arnold W. Gilbert and Mr. James Gilbert. It was part of the established practice and usage at this used car lot to let prospective purchasers try out automobiles before they bought them. Approximately five percent of the cars sold at this time at this car lot were sold to persons under twenty-one years of age. It was also the established custom and usage at the car lot that

†Judge Barnett is serving as a judge pro tempore of the Supreme Court pursuant to art. 4, § 2(a) (amendment 38), state constitution.

when persons under twenty-one years of age came in with a responsible adult they would be permitted to take out a car together. Mr. Arnold W. Gilbert was given express permission to try out the car, and James Gilbert was also given implied permission to drive the car. Mr. Arnold W. Gilbert drove the car out of the lot and later, while he and James Gilbert were trying out the car, Mr. James Gilbert was permitted to drive the automobile.

5. The 1951 Chevrolet being driven by James Gilbert, accompanied by Mr. Arnold W. Gilbert, his father, was, on November 16, 1958, shortly after they had picked up the automobile from Larson Auto Brokers, involved in an accident at the intersection of West 62d Street and Fifth Northwest in the general vicinity of the Larson Auto Brokers place of business, said accident being in the City of Seattle, King County, Washington. The other vehicle involved in the accident was a 1952 Chevrolet 4-door sedan belonging to and being driven by Mabel S. Brown who was accompanied in her car at the time of the accident by her minor son Waldo Brown. Both Mabel Brown and her minor son Waldo Brown were injured in the accident and the accident was caused by the negligence of the driver James Gilbert in failing to yield the right of way to the Brown vehicle which was on his right in an unmarked intersection, and in driving at an excessive rate of speed.

Pacific assigns as error the admitting into evidence of certain testimony of James Gilbert. He testified by deposition. The question propounded was:

Did you do anything at all while you were at Larson's Auto Brokers, either before or after the accident, which might indicate you were going to drive the car? A. Well, the salesman did know the car was for me and he said that, well, it was made clear because my dad had told them he didn't want the car. *He did say himself that he knew the car was for me.* (Italics ours.)

The court sustained the objection to the first sentence and admitted the last.

It is argued that the answer was not responsive. Patently the answer was competent and admissible with reference to the implied permission of James Gilbert to drive the car and it was not reversible error requiring a new trial. *Bussard v. Fireman's Fund Indem. Co.*, 44 Wn.2d 417, 267 P.2d

1062. Furthermore, the testimony was adduced by deposition. The court can see upon inspection that, although the form of the question may be technically objectionable, the answer furnishes proper evidence. Substance, rather than form, should be heeded. See 16 Am. Jur. *Depositions* § 132, p. 757.

The second assignment of error focuses attention upon finding of fact No. 4. It is contended that the evidence does not support a finding that Laddie Henderson was told that the car was for James Gilbert, when that salesman stated as much in a conversation he had with Arnold Gilbert and James Gilbert. It is urged, also, that there is no evidence that persons under 21 would be permitted to take cars out if accompanied by a responsible adult, or that James Gilbert was given implied permission to drive the car.

The testimony of James Gilbert to which we have previously made reference sustains the finding that the salesman knew that the car was intended for James Gilbert. Relating to whether persons under 21 would be permitted to take cars out, Claude Larson's pretrial deposition reads in part:

> Q. All right. Now when a young man or a young lady would come in to purchase a car and would bring an adult in, an obviously responsible person or someone that appeared to you or your salesman to be responsible, would you let them take the car out and try it under those circumstances? A. Yes.

Later at trial, on cross-examination, Mr. Larson testified:

> Q. Okay. And someone under 21 who came into your lot with a responsible adult was permitted to take out a car, was he not? A. Yes. I would give it to the adult if he looked like a respectable person.

On direct examination, Mr. Larson testified to the effect that he would not let a teenager drive unless he or a salesman went along.

■ Pacific contends that the testimony elicited from Mr. Larson leads to a contrary inference than that persons under 21 would be permitted to take cars out if accompanied by a responsible adult. Such an argument relates to the weight of the evidence only rather than to the lack

of it. Since there was substantial evidence to warrant the trial court's finding, we will not disturb that finding. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 343 P.2d 183.

The second and third assignments of error question whether there was sufficient evidence to find that James Gilbert was given implied permission to drive the car and was an insured under Pacific liability.

The omnibus clause in the Pacific liability policy provides as follows:

> [T]he unqualified word "insured" includes the named insured and also includes . . . (2) any person while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with his permission.

In the instant case, we have a 16-year-old boy who went with his father to a used car lot for the purpose of looking at a used car to be purchased for the son. The boy was a licensed driver. A salesman showed a car owned by the Larson Auto Brokers to the father and son. The salesman knew the car was being purchased for the son. It was part of the established practice and usage at this lot to let prospective purchasers try out automobiles before they bought them. Approximately 5 per cent of the cars sold at this time at this lot were sold to persons under 21 years of age. It was the established custom and usage at this lot that when persons under 21 years of age came in with a responsible adult they would be permitted to take out a car together. The father was given express permission to drive the car. There was no admonition against the car being driven by the son. Does the evidence justify a finding that Larson gave implied permission to James to drive the car?

■ This court, in *McKee v. Garrison*, 37 Wn.2d 37, 39, 221 P.2d 514, discussed "implied permission" contained in a policy of liability insurance:

> What may constitute implied permission on the part of a covered owner of an automobile to another to drive it, so as to give such driver protection as an additional in-

sured, is discussed in 7 Appleman on Insurance Law and Practice 166, § 4365, where the author states:

"It has been definitely held that it is not essential that express permission be given for use of the automobile by the operator in order to give him protection as an additional insured; permission may be implied for such use under the facts and circumstances of the case. And wherever the terms 'consent', 'permission', or the like, appear in the policy, the courts consider that such terms may be read as though the word 'implied' preceded them. A general permission would suffice, although if express permission is relied upon, it must be of an affirmative character, directly and distinctly stated, clear and out-spoken, and not left merely to inference. An implied per-mission, on the other hand, is not confined to affirmative action, but means an inferential permission, in which a presumption is raised from a course of conduct or rela-tionship between the parties in which there is mutual acquiescence or lack of objection signifying consent.
"   .   .   .   .

In order to infer permission within the meaning of the policy clause before us, there must be some course of conduct or relationship between the parties from which a trier of fact can conclude the owner contemplated the additional insured would make the use of the automobile out of which the claim of liability arose.

Pacific relies heavily upon *McKee, supra*, because the court held that where the owner of an automobile requested a neighbor to find out what was wrong with the brake which was "grabbing," permission to drive the automobile could not be inferred merely because the neighbor, in experimenting with the operation of the brake, thought such a venture would better enable him to discover the cause of its "grabbing." We said, p. 40:

The trial court was of the opinion that Reese neither knew nor had any reason to believe that Garrison would have occasion to drive her automobile, *she not being familiar with the methods used in automobile repairing.* (Italics ours.)

Is there any doubt that the used car salesman in the instant case, knowing that the car was to be purchased for the boy, entertained the slightest notion that the boy

would not drive the car to test it with his father? A woman may not know how brakes are tested, but surely a used car salesman knows that a father is going to let his son test-drive a car that is bought for the son. The sagacious trial judge did not err in his ruling.

Safeco also contends in essence that, because Arnold Gilbert was given express permission to use the car, to try it out, there being no deviation from that use, Arnold Gilbert had implied permission to delegate the driving to James.

Not only was it the son's purpose to look for a car for himself, but looking for a car for his son was likewise the father's purpose. The accident occurred near the used car lot just after the Gilberts had picked up the car and, while the Gilberts were fulfilling the purpose of trying it out, the son was permitted by the father to drive.

These facts come within the purview of *Wood v. Kok,* 58 Wn.2d 12, 360 P.2d 576. In that case, Kok was granted permission by the owner of the car to take possession for the purpose of trying it out in contemplation of trading automobiles. He permitted a 14-year-old girl friend, an unlicensed driver, to drive the car. While she was driving and he was sitting next to her, the accident occurred. The Woods were granted judgment against Kok. The girl driver was a stranger to the owner of the car, who did not know Kok was permitting her to drive until after the accident. In holding that Kok came within the omnibus clause of a policy, this court said, p. 15:

> "Use" and "operation" as used here are not synonymous terms. A person may be using an automobile and yet not be operating it. At the time of the accident, Ronald was using the automobile for his own convenience and pleasure. It makes no difference under the omnibus clause that, in carrying out this use, he had another person operating the automobile. At the same time, the automobile was being put to his use.

See, also, 7 Am. Jur. 2d *Automobile Insurance* § 117, p. 435.

In a case, not cited in the briefs, recently decided by the Ninth Circuit Court of Appeals, *State Farm Mut.*

*Auto Ins. Co. v. Williamson,* 331 F.2d 517, 520, the court said:

> If an owner reasonably should anticipate that, in view of the scope and nature of the permission granted (even if less than unfettered dominion), and because of the permittee's *relationship to another*, the permittee will allow that other to use the car, the owner's permission, without more, can be found to encompass permission for that use. (Italics ours.)

Here, we have the relationship of father and son, each looking for a car for the son. Under this second theory also, Arnold Gilbert had implied permission to delegate the driving of the car to his son James.

Referring now to the fourth, fifth and sixth assignments of error, Pacific contends that, in the event the court should find it liable, the loss should be sustained by both companies on a pro rata basis. This argument is premised on the respective provisions of the two policies.

The Safeco policy provides:

> Other Insurance. If the insured has other insurance against a loss covered by the Physical Damage Section of this policy, SAFECO shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability of this policy bears to the total applicable limit of liability of all valid and collectible insurance against such loss; provided, however, the insurance hereunder with respect to temporary substitute automobiles or to non-owned automobiles shall be excess insurance over any other valid and collectible insurance.

The Pacific policy reads:

> Other Insurance. If the insured has other insurance against a loss covered by this policy the company shall not be liable under this policy for a greater proportion of such loss than the applicable limit of liability stated in the declarations bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

It is argued that the two policies are in conflict and there is no logical reason or legal basis for the court to prefer one over the other.

In approaching this question, we call attention to *Central Surety & Ins. Corp. v. London & Lancashire Indem. Co. of*

*America,* 181 Wash. 353, 43 P.2d 12, not cited in the briefs of either counsel. In that case, where the liability insurer of a real-estate company and the liability insurer of an agent of that company on account of whose negligence in driving her automobile it appeared that the policy issued to the agent specifically indemnified her from action taken against her individually by her employer, it was held that the insurer of the real-estate company could not be held liable until liability exceeded the coverage afforded by the policy issued to the agent, since the former policy was *an excess limit policy only.*

In 8 Appleman, Insurance Law and Practice § 4914, p. 400, it is said:

> Liability Coverages Generally—Primary Versus Excess Coverage.
>
> It has been held that where the owner of an automobile or truck has a policy with an omnibus clause, and the additional insured also has a non-ownership policy which provides that it shall only constitute excess coverage over and above any other valid, collectible insurance, the owner's insurer has the primary liability. In such case, the liability of the excess insurer does not arise until the limits of the collectible insurance under the primary policy have been exceeded. It should be noted that under this rule, the courts give no application to the other insurance clause in the primary policy, which provides that if the additional insured has other valid and collectible insurance, he shall not be covered by the primary policy. That is because the insurance under the excess coverage policy is not regarded as other collectible insurance, as it is not available to the insured until the primary policy has been exhausted. Or, to put it another way, a non-ownership clause, with an excess coverage provision, does not constitute other valid and collectible insurance within the meaning of a primary policy with an omnibus clause.

■ The question to be determined is who has the primary liability. In 7 Am. Jur. 2d *Automobile Insurance* § 202, p. 544, the rule is stated as follows:

> Many cases have arisen involving conflicts between insurance policies both of which purport to restrict or escape liability for a particular risk in the event that there is

other insurance. Such conflicts have arisen, under automobile liability policies covering the same risk, in the following situations: (1) where one of the policies contains an "excess insurance" clause and the other contains a "pro rata" clause; (2) where one of the policies contains an "excess insurance" clause and the other a "no liability" clause; (3) where both of the policies contain an "excess insurance" clause; (4) where one of the policies contains a "pro rata" clause and the other contains a "no liability" clause; and (5) where a "no liability" clause expressly designates the types of insurance with which it might conflict.

*In the first situation mentioned above—that is, where one of the policies contains an "excess insurance" clause and the other a "pro rata" clause—and the "excess insurance" clause pertains to nonownership coverage, the conclusion is generally reached—no matter how various the reasoning adopted in support of it in the different cases may be—that the policy issued to the owner of the vehicle is the "primary" policy, and the company issuing it is liable up to the limits of the policy without apportionment.* (Italics ours.)

It is argued that the "excess" provision in Safeco's policy conflicts with the "prorating" provision in Pacific's policy. This is not necessarily so, however. In 8 Appleman, Insurance Law and Practice § 4914, p. 403, it is said:

It is possible to have an "excess" provision in a policy applicable in certain situations; and such does not necessarily conflict with another provision referring to "prorating."

In *American Surety Co. of New York v. Canal Ins. Co.,* 258 F.2d 934 (4th Cir. 1958), it was held that an excess insurance clause in a motor vehicle liability policy is neither invalid nor unconscionable and may be given effect without invalidating a pro rata contribution clause in a policy providing other protection.

In *Citizens Mut. Auto. Ins. Co. v. Liberty Mut. Ins. Co.,* 273 F.2d 189, 193 (6th Cir. 1959), the court, citing the majority view, held that

when an excess clause in one automobile liability insurance policy conflicts with another "other insurance" clause, and more particularly a "pro-rata" clause, in a

second policy, the excess clause controls and is to be given its full effect.

In *Mountain States Mut. Cas. Co. v. American Cas. Co.*, 135 Mont. 475, 342 P.2d 748, the court cited Appleman, *supra*, in holding that even though a garage policy provided that its coverage applied only pro rata that excess coverage provided by a nonownership policy was not other insurance as to which liability could be applied.

We have examined numerous authorities dealing with this problem and find that the overwhelming majority view supports the finding of the trial court that Pacific has the primary liability under the provisions of the two policies.

Judgment affirmed.

ROSELLINI, C. J., WEAVER, HUNTER, and HAMILTON, JJ., concur.